IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| LANDY C. LEEP,<br><br>                    Plaintiff,<br><br>vs.<br><br>TRINITY UNIVERSAL INSURANCE<br>COMPANY,<br><br>                    Defendant/Third-Party<br>                    Plaintiff,<br><br>vs.<br><br>SPRAUGE CONSTRUCTION<br>ROOFING, LLC, a Montana Limited<br>Liability Company,<br><br>                    Third-Party Defendant. | CV 16-57-BLG-TJC<br><br><br>**ORDER REGARDING<br>CROSS MOTIONS FOR<br>PARTIAL SUMMARY<br>JUDGMENT** |

       Plaintiff Landy C. Leep ("Leep") filed this action against Defendant/Third-Party Plaintiff Trinity Universal Insurance Company ("Trinity"), seeking declaratory judgment that a homeowner's insurance policy issued by Trinity provides coverage for certain losses to Leep's residence.  (Doc. 19.)  Trinity filed a Third Party Complaint against Third-Party Defendant Sprauge Construction Roofing, LLC ("Sprauge") for indemnity.  (Doc. 13.)

       Presently before the Court are Leep's Motion for Partial Summary Judgment, and Trinity's Cross-Motion for Partial Summary Judgment.  (Docs. 33,

1

41.)  The motions are fully briefed and ripe for the Court's review.  Having considered the parties' submissions, the Court finds Leep's Motion for Partial Summary Judgment should be **GRANTED**, and Trinity's Cross Motion for Partial Summary Judgment should be **DENIED**.

## I.     BACKGROUND

### A.     Factual Background[1]

Leep owns a home located at 2532 North Shore Place, Billings, Montana (the "Property").  (Doc. 35 at ¶ 2.)  Leep purchased a homeowner's policy from Trinity numbered DG 306868 (the "Policy").  (*Id.* at ¶ 3.)  While Leep was insured by Trinity, the Property sustained damage as a result of a hail storm that occurred on May 18, 2014.  (*Id.* at ¶ 14.)

Leep contracted with Sprauge to repair the hail damage.  (*Id.* at ¶ 15.) Sprauge started the repair work on August 11, 2015, and completed the work between August 12, 2015 and August 18, 2015.  (Doc. 53 at ¶ 8.)  Sprauge's repair work included tearing off and replacing roof lining and shingles.  (*Id.* at ¶ 7.)  The parties dispute whether the work included replacing vent piping.  (*Compare* Doc. 43 at ¶ 7 and Doc. 53 at ¶ 7.)  Trinity contends Sprauge's work included "replacing

---

[1] The background facts are taken from the parties' submissions, including Leep's Statement of Undisputed Facts (Doc. 35), Trinity's Statement of Undisputed Facts (Doc. 43), Trinity's Statement of Disputed Facts (Doc. 44), Sprauge's Statement of Disputed Issues (Doc. 53), and the parties' Statement of Stipulated Facts (Doc. 65). The information is undisputed except where indicated.

three through-the-roof tubes and replacing furnace vent and flashing." (Doc. 43 at ¶ 7.) Trinity points out that the roofing materials delivered to Leep's Property on August 11, 2016, included three "through the roof tubes." (Doc. 35 at ¶ 17.) Sprauge contends it only replaced a vent cap, and the "through the roof tubes," were caulking tubes. (Doc. 53 at ¶¶ 7, 11, 15.) Sprauge states it did not replace any vent piping or "vents." (*Id.*)

The Terms & Conditions of the contract executed between Leep and Sprauge stated "[i]t is the responsibility of the owner to check the exhaust vents for all furnaces and water heaters after the roofing project is complete." (Doc. 35 at ¶ 21.) Leep admitted that he did not "check the exhaust vents for all furnaces and water heaters" after Sprauge's installation of the new roof. (Doc. 65 at ¶ 26.)

On January 17, 2016, Leep's house guest noticed water dripping from a bathroom fan on the main level of the Property. Leep subsequently inspected the second story of the Property and noticed moisture emanating from the ceiling. Leep contacted a representative of Sprauge, Jack Sprauge, and set up an appointment with him to visit the Property on January 19, 2016. (Doc. 65 at ¶8; Doc. 53 at ¶ 9.)

On January 18, 2016, Leep located the Property's attic access, and discovered the furnace vent piping was disconnected, and the furnace exhaust was

venting into the attic. (Doc. 65 at ¶ 9.) The furnace vent pipe should have exited the Property through an exterior roof vent. (*Id.* at ¶ 10.)

On January 19, 2016, Jack Sprauge met Leep at the Property at 8:00 a.m., and they inspected the attic. (*Id.* at ¶ 11.) That same day, Leep also met with Tom L. Roberts ("Roberts"), an HVAC service technician from Comfort Heating & Air Conditioning, to examine the disconnected furnace vent pipe. (*Id.* at ¶ 12.) During the service appointment, Leep advised Roberts that Sprauge had recently replaced the roof, and Leep stated his belief that the furnace vent pipe became disconnected during the roofing construction. (*Id.* at ¶ 12.) Roberts observed the disconnected furnace pipe, and also noticed one of the straps securing the furnace vent piping to the attic ceiling joists was broken in half. (*Id.* at ¶ 13.) Roberts opined that the furnace vent pipe became disconnected during the roofing construction and replacement of the furnace roof vent and flashing. (Doc. 49 at ¶ 15.)

On January 19, 2016, Leep reported a water damage claim to Trinity claims representative, Laura Shamhart ("Shamhart"). (Doc. 65 at ¶ 14.) Leep identified the date of loss as August 1, 2015. (*Id.*) When Leep reported his claim to Shamhart, he indicated the Property's furnace vent pipe was disconnected from the exterior vent and the furnace exhaust had been venting into the attic space. (*Id.* at 15.) He stated Sprauge had replaced the roof in August 2015, and also

communicated his belief that Sprague did not properly connect the new roof vent to the attic. (*Id.*; Doc. 49 at ¶ 17.)

On January 21, 2016, Trinity sent field adjuster, Thomas J. Lynn ("Lynn") of Insurance Claim Adjusters, Inc. to inspect the Property. (Doc. 65 at ¶ 16.) During the inspection, Leep again communicated to Lynn his belief that Sprauge had detached the Property's furnace vent pipe. (*Id.* at ¶ 17.) Lynn observed moisture damage at the Property, including a large amount of mold in the attic area and wet insulation which was in need of replacement. Lynn completed a loss report on January 25, 2016, opining the damage appeared to have occurred over an extended period of time, and that it was caused by the detached furnace vent pipe. (*Id.* at 18.) Lynn opined that Sprauge's detaching the furnace vent pipe caused moisture and/or water damage to the Property. (Doc. 53 at ¶ 21.)

On January 29, 2016, Trinity mailed a letter to Leep, stating in part: "[Leep] indicated during [Trinity's] inspection that [Leep] believe[s] the cause of this damage [i.e., water and or moisture damage] is related to the roofing contractor's failure to properly install the furnace vent and cap when the roof was replaced in August of 2015." (Doc. 65 at ¶ 19.) Trinity then requested the opportunity to further investigate the claim, including having an engineering inspection of the Property conducted. (*Id.*)

On February 2, 2016, professional engineer, Scott A. Curry ("Curry") of EFI Global Inc. conducted a site visit and engineering investigation at the Property. During the site visit, Curry interviewed Leep and his contractors, Steven Hanlin and Rusty of SERVEPRO and Bob Pentecost of Bob Pentecost Construction. (Doc. 65 at ¶ 20.) Leep communicated to Curry his belief that Sprauge disconnected the furnace vent pipe during the roofing work. (*Id.* at ¶ 21.) At the time of Curry's visit, the furnace vent pipe had been reconnected. (*Id.* at ¶ 22.)

Curry completed an engineering report on February 6, 2016. (Doc. 53 at ¶ 26.) Curry opined that the attic and a significant portion of the residence interior was wetted from a furnace vent that was disconnected in the attic. (*Id.*) Curry also opined that Sprauge's disconnecting the furnace vent pipe in the late summer of 2015 is consistent with the nature and extent of water and/or moisture damage to the Property. (*Id.*)

Contrary to these opinions and Leeps statements, Sprauge asserts it did not replace any vent piping or vents; it disputes that it detached or disconnected the furnace vent piping; and disputes that its' work caused any of the damage to Leep's home. (Doc. 53 at ¶¶ 7, 11-15, 17, 19, 21, 24, 25, 27.)

Trinity sent Leep a letter on February 22, 2016 denying his claim. (Doc. 65 at ¶ 23; Doc. 37-6.) The letter advised that the Property sustained damage as "the result of improperly installed roof vent flashing and furnace vent flu," which was

excluded from coverage under the exclusions for faulty, inadequate or defective design, specifications, workmanship, repair, construction, renovation or remodeling, and faulty, inadequate or defective materials used in repair, construction or renovation. (Doc. 37-6 at 2.[2]) Trinity also cited to limitations in coverage for mold, fungus and wet or dry rot. (*Id.* at 5-6.)

On March 8, 2016, Leep's attorney sent a letter responding to Trinity's coverage decision. (Doc. 65 at ¶ 24; Doc. 37-8.) Leep's attorney pointed out that the furnace vent flu was not within the scope of work contracted between Leep and Sprauge. (Doc. 37-8.) The letter stated "[t]here was not defective repair or renovation because the repair and renovation did not require the roofer to check exhaust vents of all furnaces and water heaters, rather the contract made it the responsibility of the owner to check exhaust vents and water heaters." (*Id.* at 2.)

On April 6, 2016, Trinity sent Leep another letter declining coverage. (Doc. 65 at ¶ 24; Doc. 37-7.) Trinity maintained that there was no coverage due to faulty workmanship, and also stated coverage was excluded due to Leep's failure to maintain the property. (*Id.*) The letter stated "[t]he efficient proximate cause of the loss was the contractor's improper repair of the roof that caused the vent to become dislodged. The ensuing damage that resulted from the moisture

---

[2] Unless otherwise noted, all page numbers cited herein refer to page numbers in the Court's electronic filing system.

disseminating into the attic space through the dislodged vent is not a separate loss under the policy but would be considered a direct result of the contractor's failure to properly repair the roof." (Doc. 37-7 at 1.) The letter continued, "our investigation indicates that the roofer's workmanship resulted in the separation of the vent within the attic space and set the other causes of damage in motion. Together with the insured's failure to inspect the pipe, or maintain the property as outlined in the contract with Sprauge, the subsequent accidental discharge of water or steam from within the heating system would not have occurred and cannot be considered a separate loss under the policy." (*Id.* at 2.)

### B. Procedural Background

On April 13, 2016, Leep filed the instant action in the Montana Thirteenth Judicial District Court, Yellowstone County, Montana, seeking a declaration that the Policy provides coverage for his claim. (Doc. 1.) Leep also brought a cause of action for violation of the Consumer Protection Act, Mont. Code Ann. § 30-14-103. (*Id.*) On May 17, 2016, Trinity removed the case to federal court based on diversity jurisdiction under 28 U.S.C. § 1441(b). (*Id.*)

On June 3, 2016, Trinity filed a Third-Party Complaint against Sprauge. (Doc. 13.) Trinity alleges that if the furnace vent became disconnected as alleged by Leep, and/or the moisture entered the attic past the furnace vent roof flashing, Sprauge completed its work in a negligent or unworkmanlike manner. (*Id.* at ¶ 12.)

Therefore, Trinity contends that if the Court finds in Leep's favor on the coverage issue, Trinity is entitled to indemnity and/or contribution from Sprauge. (*Id.* at ¶¶ 15-22.)

On June 6, 2016, Leep filed a First Amended Complaint, which removed the Consumer Protection Act claim, and added causes of action for breach of insurance contract and breach of the Montana Unfair Trade Practices Act. (Doc. 19.)

On March 28, 2017, the Court granted in part, and denied in part Sprauge's motion for judgment on the pleadings. (Doc. 60.) The Court dismissed Trinity's claim for contribution, but permitted Trinity's indemnification claim to go forward. (*Id.*)

On October 13, 2016, Leep filed a motion for partial summary judgment on the issue of whether there is insurance coverage for the damage to his home under the Policy. (Doc. 33.) Leep argues the faulty workmanship exclusion does not apply because connecting or ensuring connection of the furnace vent was not within Sprauge's scope of work. Leep further argues, that even if the exclusions for faulty workmanship or maintenance apply, the loss is nevertheless covered under the policy's ensuing loss exception. Finally, Leep asserts that the intrusion of water vapor is an otherwise covered event, and the coverage limits for mold and fungi do not apply.

On November 17, 2016, Trinity filed a cross-motion for partial summary judgment, seeking a more limited ruling that the faulty workmanship exclusion in the Policy precludes coverage, and requesting dismissal of Plaintiff's claim for breach of contract as a matter of law.[3] (Doc. 41.) Trinity argues Sprauge did not perform its work in a reasonable, workmanlike manner, and therefore, the faulty workmanship exclusion bars coverage. Trinity further argues the ensuing loss provision is not applicable because there was no separate, independent or intervening cause of loss apart from Sprauge's faulty workmanship.

Sprauge takes no position with regard to Leep's motion for partial summary judgment. (Doc. 40). Sprauge opposes Trinity's motion, however, on grounds that there are material issues of fact regarding how the furnace vent pipe was disconnected. (Doc. 52.)

/ / /

/ / /

/ / /

/ / /

---

[3] Trinity indicated that it was reserving its argument that there is no coverage based on any other exclusions and/or limitations under the policy because "the primary efficient cause of loss is Sprauge's faulty workmanship." (Doc. 42 at 14, n.1.) The Court notes that Leep's motion for partial summary judgment seeks a broader ruling on coverage than Trinity's motion, and that Trinity did not specifically dispute Leep's claims that the loss is otherwise covered under the policy, or that the limitations on liability for mold and fungi do not apply.

## II. ANALYSIS

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable fact-finder to return a verdict for the nonmoving party. *Id*.

The moving party bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the opposing party will have the burden of proof at trial, the moving party need only point to an absence of evidence to support the nonmoving party's case. *Id.*

When parties file cross-motions for summary judgment, as here, the Court must consider each motion on its own merits. *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). The fact that both parties have moved for summary judgment does not vitiate the Court's responsibility to determine whether disputed issues of material fact are present. *Id.*

B.    Application of Montana Law

As noted, the Court's jurisdiction over this action is based on diversity of citizenship. Thus, the Court must apply the substantive law of Montana. *Medical Laboratory Mgmt. Consultants v. American Broadcasting Companies, Inc.*, 306 F.3d 806, 812 (9th Cir. 2002).

In actions based on diversity jurisdiction, the federal court "is to approximate state law as closely as possible in order to make sure that the vindication of the state right is without discrimination because of the federal forum." *Gee v. Tenneco, Inc.*, 615 F.2d 857, 861 (9th Cir. 1980). Federal courts "are bound by the pronouncements of the state's highest court on applicable state law." *Appling v. State Farm Mutual Auto. Ins. Co.*, 340 F.3d 769, 778 (9th Cir. 2003) (citation omitted). But when an issue of state law arises and "the state's highest court has not adjudicated the issue, a federal court must make a reasonable determination of the result the highest state court would reach if it were deciding the case." *Medical Laboratory Mgmt. Consultants*, 306 F.3d at 812 (citations omitted). In doing so, the federal court must "look to existing state law without predicting potential changes in that law." *Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931, 939 (9th Cir. 2001) (citation omitted).

In Montana, the interpretation of an insurance contract is a question of law. *Scentry Biologicals, Inc. v. Mid-continent Cas. Co.*, 374 Mont. 18, 23 (2014). A

court interpreting an insurance policy is to read the policy as a whole and, to the extent possible, reconcile the policy's various parts to give each meaning and effect. *O'Connell v. Liberty Mut. Fire Ins. Co.*, 43 F.Supp.3d 1093, 1096 (D. Mont. 2014) (*citing Newbury v. State Farm Fire & Cas. Ins. Co. of Bloomington, Ill.*, 343 Mont. 279 (2008)).

C.    The Policy

The Policy at issue in this case is an "all-risk" policy, meaning it provides coverage for all perils, unless the specific peril is excluded. The Policy contains an exclusion for faulty workmanship and maintenance. But the exclusion also contains an ensuing loss provision. Generally, an ensuing loss provision operates as an exception to the policy exclusion. *See* David J. Marchitelli, *What Constitutes "Ensuing Loss" Caused by Water Damage Within Coverage Provision of Property Insurance Policy*, 14 A.L.R.7th Art. 6 (2016). In the event an ensuing loss provision is triggered, there is coverage, as long as the loss is not otherwise excluded. *Id. See also Vision One, LLC v. Philadelphia Indem. Ins. Co.*, 174 Wash.2d 501, 515 (2012) (explaining that an "ensuing loss clause operates to carve out an exception to the policy exclusion," and therefore "limit[s] the scope of what is otherwise excluded under the policy. Such clauses ensure 'that if one of the specified uncovered events take place, any ensuing loss which is otherwise covered by the policy will remain covered.'").

The relevant provisions of the Policy provide:

SECTION 1 - EXCLUSIONS

2.    We do not insure for loss to property described in Coverages A and B
      caused by any of the following.
      However, any ensuing loss to property described in Coverages A and
      B not excluded or excepted in this policy is covered.
      . . .
      c. **Faulty, inadequate or defective:**
      . . .
            2) Design, specifications, workmanship, repair, construction,
            renovation, remodeling, grading, compaction,
            . . .
            4) Maintenance.

(Doc. 37-1 at 14.)

The Policy contains a "mold, wet or dry rot" exclusion.  (Doc. 37-1 at 11.)

That exclusion, however, was deleted and replaced by a "HOMEOWNERS

POLICY – ULTIMATE ENDORESEMENT MONTANA" and "LIMITED

FUNGI, WET OR DRY ROT, OR BACTERIA COVERAGE" endorsement.  (*Id.*

at 39, 48-49.)  Ultimately, the Policy provides:

We insure against risk of direct loss to property described in Coverages A, B
and C only if that loss is a physical loss to property.  We do not insure,
however, for loss:
. . .
3. Caused by:
. . .
d. Mold, fungus or wet rot.  However, we do insure for loss caused by mold,
fungus or wet rot that is hidden within the walls or ceilings or beneath the
floors or above the ceilings of a structure if such loss results from the
accidental discharge or overflow of water or steam from within:

14

       1) A plumbing, heating, air conditioning or automatic fire protective sprinkler system or a household appliance on the "residence premises;"

. . .

e. Any of the following:

       1) Wear and tear, marring or deterioration;
       2) Mechanical breakdown, latent defect, inherent vice, or any quality in property that causes it to damage or destroy itself;

. . .

f. Constant or repeated seepage or leakage of water or the presence or condensation of humidity, moisture or vapor, over a period of weeks, months or years from a plumbing system unless such seepage or leakage of water or the presence or condensation of humidity, moisture or vapor and the resulting damage is unknown to the "insureds" and is hidden within the walls or ceilings or beneath the floors or above the ceilings of a structure.

. . .

Exceptions to 3.e
Unless the loss is otherwise excluded, we cover loss to property covered under Coverages A, B or C resulting from an accidental discharge or over-flow of water or steam from within a:

. . .

       ii) Plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance on the "residence premises." This includes the cost to tear out and replace any part of a building, or other structure, on the "residence premises," but only when necessary to repair the system or appliance. However, such tear out and replacement coverage only applies to other structures if the water or steam causes actual damage to a building on the "residence premises."

(Doc. 37-1 at 39-40, 48-49.)

      D.    <u>Faulty Workmanship Exclusion</u>

As noted above, both parties have moved for summary judgment on the application of the faulty workmanship exclusion. Leep maintains the exclusion does not apply; Trinity asserts that the exclusion applies to bar Leep's claim, as a matter of law.

1.  <u>Leep's Motion for Partial Summary Judgment, Faulty</u>
    <u>Workmanship Exclusion.</u>

Leep contends the faulty workmanship exclusion should not apply because the scope of work Sprauge undertook was limited to the exterior portions of the roof. Leep states that Sprauge was not contracted to, and did not, work on the heating system. He reasons, therefore, that any loss caused by the heating system should not fall within the policy's exclusion for faulty workmanship. Leep points out that the contract he entered with Sprauge provided that it was the homeowner's responsibility to "check the exhaust vents for all furnaces and water heaters after the roofing project is complete." (Doc. 36 at 41.) Leep also notes that Sprauge's final inspection checklist was confined to the exterior of the Property's roof. (Doc. 36 at 12.)

Trinity counters that Sprauge's contract with Leep does not change the implicit requirement in any construction contract that the contractor perform its work in a reasonable and workmanlike manner. Trinity contends Sprauge's poor workmanship caused the loss, and therefore, the faulty workmanship exclusion precludes coverage.

The Court finds the terms of the contract between Leep and Sprauge do not control whether the faulty workmanship exclusion applies. Regardless of the parties' responsibilities under the contract, the contract simply does not answer the question of whether Sprauge's workmanship was faulty. It is conceivable that a

16

contractor could cause incidental damage to a part of a home that the contractor was not specifically contracted to work on, and any such damage would be excluded under the policy.

Further, the terms of the Policy do not limit the exclusion to only faulty workmanship that falls within the scope of work agreed upon between the insured and a contractor. Rather, the exclusion broadly applies to "any" losses caused by faulty workmanship. (*See* Doc. 37-1 at 14.) Therefore, if Sprauge, in the course of repairing the roof, caused damage to another part of the Property, the exclusion would be triggered. The Court finds it is possible, based on the facts and circumstances of this case, that the exclusion may apply. Accordingly, the Court rejects Leep's argument that the faulty workmanship exclusion does not apply based on the contract between Leep and Sprauge.

2. Trinity's Motion for Summary Judgment, Faulty
   Workmanship Exclusion

Although the Court finds the faulty workmanship exclusion may be applicable, the Court also finds there are disputed issues of material fact regarding whether Sprauge's workmanship was, in fact, faulty. When "direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact," and summary judgment must be

denied. *T.W. Elec. Serv., Inc. v. Pacific Electric Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).

Trinity argues there is no genuine issue of material fact that Sprauge disconnected the furnace vent pipe, and that Sprauge's disconnecting the vent pipe was the efficient proximate cause of the loss. Trinity cites to statements Leep made to four people that he believed Sprague disconnected the furnace vent pipe. (Docs. 43-2 at ¶ 5; 43-4 at ¶ 5; 43-5 at ¶ 5; and 43-6 at ¶ 6.) Trinity also states three individuals who inspected the Property (the HVAC technician Roberts, the field adjuster Lynn, and the engineer Curry) all opined the vent pipe became disconnected during Sprauge's roofing work (Docs. 43-4 at ¶ 8; 43-5 at ¶ 7; and 43-6 at ¶ 9). Trinity also points to Leep's statement that Jack Sprauge admitted to Leep that the pipe was most likely disconnected during the roofing construction. (Doc. 43-1 at 4.)

Sprauge contests Trinity's assertions, and argues there are several material disputed facts regarding how the furnace vent pipe became disconnected. Sprauge cites to the affidavits of its owners and its discovery responses, which state Sprauge did not disconnect the furnace vent pipe or replace the furnace vent and flashing, but instead only replaced a vent cap on the outside of the roof. (Doc. 53-1 at 7-8, 11; Doc. 53-3 at ¶¶ 7-9, 17; Doc. 53-4 at ¶¶ 7-8, 10.) Sprauge states neither it, nor its subcontractor entered Leep's home to do the roofing work, and points out

that the disconnected vent piping was located inside the attic space.  (Doc. 53-2; Doc 53-3 at ¶¶ 10, 12; Doc. 53-3 at ¶ 7).  In this regard, Sprauge contends Trinity makes inaccurate assumptions about the meaning of the phrase "through-the-roof-tubes" that appeared on a materials invoice.  Sprauge submits Trinity incorrectly assumes from this entry that the repair work included "replacing three through-the-roof tubes."  (Doc. 43 at ¶ 7.)  Sprauge asserts the three "through-the-roof-tubes" are caulking tubes, and not vent piping. (Doc. 53-3 at ¶ 7; Doc. 53-4 at ¶6.)

Sprauge further disputes the opinions of the HVAC technician Roberts, the field adjuster Lynn, and the engineer Curry, that Sprauge disconnected the vent pipe.  Sprauge asserts there is inadequate foundation for their opinions, and that their opinions on that point are largely based on statements and assumptions made by Leep, who is not a roofing expert.  (Doc. 43-4 at ¶ 5; Doc. 43-5 at ¶ 5; Doc. 43-6 at ¶ 6; Doc. 53-3 at ¶ 17; Doc. 53-4 at ¶ 10.)

Sprauge also counters these opinions with those of its owners, who state that in the history of the company, this was the first time a complaint had been made that an internal vent pipe was disconnected by external replacement of a vent cap.  (Doc. 53-3 at ¶¶ 13; Doc. 53-4 at ¶ 9.)  They further opine that the vent pipe could only have become disconnected if it were improperly secured.  (Doc. 53-3 at ¶ 7, 16; Doc. 53-4 at ¶ 12.)

Sprauge also disputes Trinity's assertion that Jack Sprauge "agreed the furnace piping was most likely pulled apart during the roof construction." (Doc. 43 at ¶ 12.) Sprauge cites its discovery responses indicating it did not replace any vent piping, and also Jack Sprauge's opinion that based on his experience and training, "Sprauge did not cause the vent piping to become disconnected." (Doc. 53-3 at ¶ 17.)

The Court notes there are also disputed facts regarding whether Sprague was negligent for failing to discover the disconnected vent. Trinity cites the opinion of HVAC technician Roberts to argue a reasonable roofer working with the furnace vent piping should have known he or she disconnected the vent. (Doc. 43-4 at ¶ 8.). Whereas, Leep submitted a declaration from roofer Dane A. Bradford, who opined even if the furnace vent had become disconnected during the re-roofing project, the roofer would not necessarily know it from an exterior inspection of the roof. (Doc. 51 at ¶ 7.) Sprauge has submitted a declaration from its owner that states Sprauge's work did not entail entering Leep's home, and that it is not Sprauge's practice to inspect internal vents or piping. (Doc. 53-3 at ¶ 10, 14.)

In light of the above, there are clearly disputed facts regarding the scope of Sprauge's work, whether Sprauge was responsible for disconnecting the vent pipe, and whether a reasonable roofer would have known the vent had been disconnected. These issues of fact are material to the parties' claims and defenses,

and are properly supported by the affidavits of Sprague's owners, and Sprague's verified responses to discovery in this action. The Court, therefore, finds these issues of fact preclude a finding on summary judgment that Sprauge's work was completed in faulty or unworkmanlike manner, or its' work was the proximate cause of the vent becoming disconnected.[4]

In sum, the Court rejects Leep's argument that the faulty workmanship exclusion does not apply, and likewise rejects Trinity's argument that it is undisputed Sprauge's workmanship was faulty. Whether Sprauge's workmanship was faulty is an issue of fact, which precludes summary judgment on the faulty workmanship exclusion.

E. Ensuing Loss Provision

Even assuming, however, that the faulty workmanship exclusion applies, the Court finds there is coverage under the ensuing loss exception in the policy. The Policy does not define the term "ensuing loss." The parties have also not cited, and the

---

[4] Because Trinity argued the primary efficient cause of the loss was Sprauge's workmanship, Trinity opted not to argue that any additional exclusions, such as the inadequate maintenance exclusion, bar coverage. (Doc. 42 at 14, n.1.) In Leep's consolidated response and reply brief, he contends his home was well-maintained and the inadequate maintenance exclusion also does not bar coverage. (Doc. 48 at 4-5.) Trinity does not contest Leep's argument, other than to indicate in an unsupported footnote, that it "specifically disputes" Leep's contentions regarding maintenance. (Doc. 57 at 6, n.1.) Nevertheless, as discussed below, even if the inadequate maintenance exclusion applies, the loss would be covered under the ensuing loss provision.

Court has not found any Montana case law interpreting ensuing loss provisions in insurance policies. Several other state and federal courts have considered similar ensuing loss provisions, however, and two primary lines of authority have emerged.

On the one hand, several courts have interpreted the provision broadly to provide coverage for losses to property that occur as a consequence of an excluded event, as long as the ensuing loss is otherwise covered by the policy. *See e.g. Bartram, LLC v. Landmark Am. Ins. Co.*, 864 F.Supp.2d 1229 (N.D. Fla. 2012); *Vision One, LLC v. Philadelphia Indem. Ins. Co.*, 174 Wash.2d 501 (2012); *Arnold v. Cincinnati Ins. Co.*, 276 Wis.2d 762 (2004); *Selective Way Ins. Co. v. Nat'l Fire Ins. Co. of Hartford*, 988 F.Supp.2d 530 (2013); *Eckstein v. Cincinnati Ins. Co.*, 469 F.Supp.2d 444 (W.D. Ky. 2007).

In *Bartram*, for example, an apartment complex suffered damage from water intrusion that occurred because of faulty workmanship in the construction of the apartments. *Bartram*, 864 F.Supp.2d at 1233. The apartment complex was insured under a policy that contained a faulty workmanship exclusion, and an ensuing loss provision. *Id.* at 1232. The Court determined that the cost to repair the faulty workmanship itself was excluded. *Id.* at 1235. However, the loss occurring subsequent to, and as a result of the faulty workmanship was covered "regardless of whether the loss was naturally set in motion by excluded cause of loss." *Id.*

Similarly, in *Arnold* the court considered whether there was coverage under an ensuing loss provision for water damage caused by rain that had leaked through windows after the window caulking had been damaged by a contractor. *Arnold*, 276 Wis.2d at 786. The court concluded the ensuing loss provision, which was identical to the one in this case, provided coverage. The court stated that an "ensuing loss is a loss that is not directly caused by faulty workmanship or faulty materials, but nonetheless follows as a 'chance, likely, or necessary consequence' of the loss caused by faulty workmanship or faulty materials," and "must result from a cause in addition to the excluded one." *Id.* at 779. The court concluded there was "no basis in the policy language for limiting the cause of an ensuing loss to a 'separate and independent peril.'" *Id.*

On the other hand, several courts have interpreted the provision more narrowly, and have found ensuing loss provisions do not provide coverage for losses that result directly and proximately from the excluded peril. Those courts generally require that there be a separate and independent cause of the loss for coverage to apply. *See e.g. TMW Enterprises, Inc. v. Federal Ins. Co.*, 619 F.3d 574 (6th Cir. 2010); *Friedberg v. Chubb & Son, Inc.*, 691 F.3d 948 (8th Cir. 2012); *Sapiro v. Encompass Ins.*, 221 F.R.D. 513 (N.D. Cal. 2004); *Acme Galvanizing Co.*

*v. Fireman's Fund Ins. Co.*, 221 Cal.App.3d 170 (1990); *Prudential Prop. & Cas. Ins. Co. v. Lillard-Roberts*, 2002 WL 31495830 (D. Or. June 18, 2002).[5]

In *Sapiro*, for example, negligent workmanship during a remodel caused water damage to the plaintiff's home. *Sapiro*, 221 F.R.D. at 521. The court rejected the plaintiff's argument that there was coverage under an ensuing loss provision. The court held that an ensuing loss is "a loss 'separate' and 'independent' from [an] original peril." *Id.* at 522. Therefore, the court found there was no coverage because the plaintiff's losses were directly attributable to the initial negligent contracting. *Id.*

Likewise, in *TMW Enterprises*, the Court held an ensuing loss provision did not provide coverage for water damage to a condominium building that occurred because the walls were improperly constructed. *TMW Enterprises*, 619 F.3d at 579-580. The court reasoned that if damage occurs "natural[ly] and continuous[ly] from the faulty workmanship, "unbroken by any new, independent cause,' the exclusion applies and the ensuing loss provision does not. . . . But if, on the other hand, the later-in-time loss flows from a non-foreseeable and non-excluded cause,

---

[5] Trinity contends the weight of authority from cases within this circuit requires a finding that an ensuing loss be an independent and separate loss from the original excluded peril in order for coverage to apply. (Doc. 57 at 9-10.) However, in the cases Trinity relies on, the courts were interpreting ensuing loss provisions under the laws of other jurisdictions, namely California and Oregon. Therefore, while the case law certainly should be considered, it is not controlling in this case, where the Court must apply Montana law.

it is covered." *Id.* at 579. The court concluded that the defective wall construction in that case "naturally and foreseeably leads to water infiltration," and therefore determined the loss was not covered as an ensuing loss. *Id.*

In the present case, application of Montana's rules of construction of insurance contracts favors the broader interpretation of the ensuing loss provision. Under Montana law, any ambiguities in an insurance contract are construed against the insurer. *Revelation Indus., Inc. v. St. Paul Fire & Marine Ins. Co.*, 350 Mont. 184, 198-99 (2009). In addition, exclusions from coverage are "narrowly and strictly construed because they are contrary to the fundamental protective purpose of an insurance policy." *Id.* (*citing Wellcome v. Home Ins. Co.*, 257 Mont. 354, 356-57 (1993)). In interpreting insurance contracts courts also must give terms and words in the contract their usual meaning and construe them using common sense. *Id*. "It is well established that in construing and analyzing the terms of an insurance policy we look first to the policy's plain language. In doing so we apply the 'common sense meaning as viewed from the perspective of a reasonable consumer of insurance products.'" *Monroe v. Cogswell Agency*, 356 Mont. 417, 421 (2007) (citing *Stutzman v. Safeco Ins. Co. of* America, 284 Mont. 372 (1997). In interpreting the ordinary meaning of "ensuing loss," the dictionary defines ensuing as "to take place afterward or as a result," *Merriam-Webster, n.d.* Web. 17 May 2017, "to follow in order; come afterward, especially in immediate

succession," or "to follow as a consequence; result." *Dictionary.com*, Web 17 May 2017.

Applying the ordinary, common sense meaning of the policy language here, a reasonable consumer of insurance products would understand that the faulty workmanship exclusion would exclude from coverage damage to property caused by faulty workmanship. But the consumer would also reasonably understand the ensuing loss provision to provide coverage for any otherwise covered loss that took place afterward or as a consequence or result of the faulty workmanship. Contrary to the cases which interpret the exclusion more narrowly, the average consumer, untrained in the law, would not naturally engage in a proximate cause analysis of this language, and attempt to determine whether a loss was a direct and natural consequence of faulty workmanship, or whether it resulted from a separate, intervening cause.

Moreover, there is nothing in the Policy's plain language to indicate that the loss must be separate and independent from the faulty workmanship. If an insurer wants to narrowly limit the ensuing loss provision to separate and independent causes, it may do so by drafting policy language to expressly exclude all losses that have resulted directly and proximately from the excluded peril.

Under other provisions of the present Policy, for example, the Policy language makes clear that Trinity would not pay for losses caused either directly or

indirectly from other excluded perils.  Under Section I.1. of the Policy, Trinity

excludes coverage for losses caused by other perils, such as earth movement,

power failure, and nuclear hazard.  Unlike the faulty workmanship exclusion,

however, those exclusions apply to loss "caused directly or indirectly" from any of

the listed perils, "regardless of any other cause or event contributing concurrently

or in any sequence to the loss."  (Doc. 3701 at 13.)  Trinity could have included

similar language for the faulty workmanship exclusion under Section I.2. of the

Policy, but instead expressly limited the application of that exclusion by the

inclusion of the ensuing loss provision.

Courts which have criticized the broader interpretation of ensuing loss

provisions have reasoned such a construction would "create a virtual if not

complete, exclusion of the exclusion."  *TMW Enterprises, Inc. v. Federal

Insurance Co.*, 619 F.3d 574, 576 (6th Cir. 2010).  But the exclusion would still

apply to exclude the cost of remedying the faulty workmanship. Granted, in this

case the cost of remedying the disconnected furnace venting is undoubtedly a

comparatively minor component of the overall loss.  That would not always be the

case, however, since the amount of excluded loss would depend entirely on the

nature and extent of the repairs required to correct the faulty workmanship.  If, for

example, the entire roof had been improperly installed in this case, and remediation

required the complete tear-off and reinstallation of the roof, the excluded cost would be much more substantial.

In short, construing the ensuing loss provision in a manner which maintains the exclusion for faulty workmanship, but provides coverage for a subsequent covered loss that occurs as a consequence or result of the faulty workmanship, is a reasonable interpretation of the policy language. It preserves the faulty workmanship exclusion, and relieves the insurer from the obligation of insuring the quality of any work performed on the premises, while at the same time provides coverage for subsequent losses which would otherwise be covered by the policy.

Furthermore, even if the more narrow construction of the ensuing loss provision is also a reasonable interpretation, the Court would still be required to construe the Policy against Trinity and in favor of coverage in this case. If the ensuing loss provision is susceptible to more than one reasonable interpretation, it is deemed to be ambiguous under Montana law. *Mitchell v. State Farm Ins. Co.,* 68 P.2d 703, 709 (Mont. 2003) ("An ambiguity exists where the contract, taken as a whole, is reasonably subject to two different interpretations.") Under Montana law, the ambiguity "must be construed in favor of the insured, and in favor of extending coverage. *Id. See also Kesling v. American Family Mut. Ins. Co.*, 861 F.Supp.2d 1274, 1284 (D. Co. 2012) (noting that because an ensuing loss provision could rationally be interpreted in more than one way, it was rendered ambiguous,

and was interpreted as providing coverage); *Moda Furniture LLC v. Chicago Title Land Trust Co.*, 35 N.E.3d 1139, (Ill. App. Ct. 2015) (same).

Therefore, assuming Sprauge's workmanship was faulty and caused the furnace vent to become disconnected, the cost to repair or replace the furnace venting is not covered under the Policy. However, the loss that followed as a result, i.e., the damage caused by the intrusion of water vapor from the furnace, is an ensuing loss. Therefore, the loss is covered, unless another exclusion or exception applies.

Trinity has not disputed Leep's arguments that the loss is otherwise covered under the Policy, and that the limit on liability for "Fungi, Wet or Dry Rot, or Bacteria Coverage" does not apply. (*See* Docs. 42; 48 at 7.) Further, upon review of the Policy, it appears the accidental discharge of water vapor from a heating system is a covered loss. (*See* Doc. 37-1 at 39-40, 48-49.) Accordingly, the Court finds the damage to the Property attributable to the release of excess water vapor from the furnace is an ensuing loss, and is covered under the Policy. As such, the Court finds summary judgment should be entered in favor of Leep on the issue of coverage.

/ / /

/ / /

/ / /

## III. CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Leep's Motion for Partial Summary Judgment (Doc. 33) is **GRANTED**, and Trinity's Cross Motion for Partial Summary Judgment (Doc. 41) is **DENIED**.

**IT IS ORDERED**.

DATED this 6th day of June, 2017.

TIMOTHY J. CAVAN
United States Magistrate Judge